## DUNNING CONSTRUCTION CO. et al. v. FRANKLIN et al.

No. 24730.    Nov. 14, 1933.

Pierce, Follens & Rucker, for petitioners.

Murrah & Bohanon and J. I. Gibson, for respondents.

WELCH, J. This is an original action to review an award of the State Industrial Commission. The employer, Dunning Construction Company, and the insurance carrier, Aetna Life Insurance Company, are petitioners, and the claimant, A. N. Franklin, and State Industrial Commission are respondents.

On December 9, 1930, the claimant sustained an injury while in the employ of the Dunning Construction Company. On January 6, 1931, he filed a claim with the State Industrial Commission under the Workmen's Compensation Law. The insurance carrier voluntarily paid compensation to the claimant for a period of 104 weeks, or two years beyond the five-day waiting period. By agreement of the parties and by order of the Commission, 52 weeks of the voluntary payments were for claimant's temporary total disability, and the remaining 52 weeks were to apply toward payment of claimant's permanent partial disability. On March 29, 1933, claimant filed a motion for a hearing, and after various hearings were conducted

by the Commission, it entered an order on May 4, 1933, finding in substance that the claimant was permanently partially disabled, and directed that the petitioners pay compensation at the rate of $18 per week for a period of 300 weeks, commencing on the 12th day of December, 1931, which was the agreed date of the end of claimant's temporary total disability. The order allowed petitioners credit for the 52 weeks' compensation voluntarily paid for permanent partial disability.

In the claim filed by the claimant it is alleged that his average daily wage at the time of the injury was $9 per day. The claimant, at the time of the injury, had worked for the employer only four or five days. The record discloses that claimant had been a carpenter for 25 or 30 years, and was employed as such by the employer at the time of the injury. The injury sustained by claimant was to his back. In a fall from a scaffold he sustained a compression fracture of the twelfth dorsal vertebra.

The attack made on the order of the Commission in this case is confined to the amount of the award. The following propositions are urged:

(1) It was error for the Commission to base the award on a finding which computed the compensation on the basis of $9 per day.

(2) In the terms of the statute compensation is to be computed on the average weekly wage. In the order complained of, the Commission makes no finding which determines the average weekly wage.

It is also contended that "one claiming compensation who remains capable of performing remunerative employment must make active efforts to procure work."

In connection with petitioners' first proposition our attention is called to section 13355, O. S. 1931, which provides as follows:

"Except as otherwise provided in this act, the average weekly wages of the injured employee at the time of the injury shall be taken as the basis upon which to compute compensation and shall be determined as follows:

"1. If the injured employee shall have worked in the employment in which he was working at the time of the accident, whether for the same employer or not, during substantially the whole of the year immediately preceding his injury, his average annual earnings shall consist of 300 times the average daily wage or salary which he shall have

earned in such employment during the days when so employed.

"2. If the injured employee shall not have worked in such employment during substantially the whole of such year, his average annual earnings shall consist of 300 times the average daily wage or salary which an employee of the same class working substantially the whole of such immediately preceding year in the same or in a similar employment in the same or a neighboring place shall have earned in such employment during the days when so employed.

"3. If either of the foregoing methods of arriving at the annual average earnings of the injured employee cannot reasonably and fairly be applied, such annual earnings shall be such sum as, having regard to the previous earnings of the injured employee and of other employees of the same or most similar class, working in the same or most similar employment in the same or neighboring locality, shall reasonably represent the annual earning capacity of the injured employee in the employment in which he was working at the time of the accident.

"4. The average weekly wages of an employee shall be one fifty-second part of his average annual earnings.

"5. If it be established that the injured employee was a minor when injured, and that under normal conditions his wages would be expected to increase, the fact may be considered in arriving at his average weekly wages."

It is contended that subdivision 2 of the above-quoted section of the statute is applicable to the facts in this case, and in support of this contention they cite Cosmos Mining Co. v. State Industrial Commission, 101 Okla. 283, 225 P. 720, and quote therefrom at considerable length. Respondents maintain that the average weekly wages of the claimant under the facts in this case are properly calculated under subdivision 1 of section 13355, supra.

Claimant testified that he had been employed by the employer in this case only four days at the date of the injury. He had worked for this same employer before that time, but it had been approximately two years prior to the time of the injury. Over objections of petitioners, claimant was permitted to testify as to the amount of his daily wage at the time of the injury, and he testified that he was receiving $9 per day. Over objections he testified further:

"Q. How long had you been employed at that rate of wage with this company, or any other company you had worked for? A. Approximately two or three years. I do

not remember when that scale of wages went into effect at this time."

The testimony clearly shows that the claimant had worked in the same employment, that of carpenter, for two or three years preceding the injury, having worked practically the whole of said period of time, with the exception of a few weeks, at a wage of $9 per day. At the time of his injury he was employed as a carpenter by the employer herein; the employer introduced testimony of the total amounts paid by it to approximately 60 carpenters who had been in its employ for a period of some three years; this testimony, however, fails to show how many days any of the men were so employed by it, nor does it pretend to establish the total amount earned by any of the carpenters during any of the years. This testimony shows clearly that the record of the payments to the carpenters only reflected the amount which had been paid to them by the Dunning Construction Company, and indicates that none of the carpenters were in the exclusive employ of this employer.

We agree with the respondent's contention that subdivision 1 of section 13355, supra, is controlling and applicable herein. The evidence in this case is uncontradicted that the claimant had worked as a carpenter for some 30 years continuously prior to the injury, and that he had been employed as a carpenter almost continuously for two or three years prior to the injury at a daily wage of $9. When he began his work for this employer he continued in the same employment at which he had been working for more than a year prior to the injury, that is to say, he continued to work as a carpenter. Subdivision 1 of section 13355, supra, is intended to control in cases such as this, where there has been no change from one line of work to another on the part of the claimant for a period of substantially the whole of the year immediately preceding his injury, and it matters not whether his continuing in the same line of work is by employment of the same or other employers.

The case of Cosmos Mining Co. v. State Industrial Commission, supra, is not applicable to the facts herein for the reason the testimony shows in that case that during the four days claimant was employed by the employer therein, he received $6.18 per day, which was the rate of weekly wages as determined by the Commission therein. That testimony, of course, did not sustain the finding of the Commission that claimant's

weekly wage was $6.18. It will be noted, however, in that case, that the evidence necessary to establish the average daily wage of the employees of the same class, working substantially the whole of the year immediately preceding the injury was to the effect that this average wage was $4.25 per day. In the instant case there is competent evidence to the effect that the claimant was employed as a carpenter, which was the same employment in which he was working at the time of the accident, during substantially the whole of more than a year immediately preceding his injury at $9 per day. In the Cosmos Case, supra, it is not shown that the claimant was engaged in the same kind of work for substantially the whole of a year immediately preceding his injury, nor is there any evidence to show how much he had been making during substantially the whole of the immediately preceding year.

We therefore conclude that the Industrial Commission did not err in finding that the claimant's average daily wage at the time of his injury was $9 per day.

The Commission found that the claimant's present wage-earning capacity was $1 per day. The evidence disclosed that on the first of January, 1933, the employer herein offered to employ the claimant as a carpenter at the rate of $3.60 per day; claimant did not accept the offer. Claimant has done no work for which he has received compensation since the date of his injury. Petitioners contend that it was claimant's duty to accept the work so offered to him, and that such offer of employment at such daily wage should be treated by this court as conclusive evidence that the claimant, at the time of the hearing, had a wage-earning capacity of $3.60 per day.

The question of the claimant's wage-earning capacity is one of fact to be determined by the Commission, and its finding thereon will not be disturbed by this court if based upon competent evidence. Such rule is too well known to justify the citation of authorities. The offer of the employment herein is competent evidence to be considered by the Commission in determining the claimant's wage-earning capacity, but it cannot be said that it is conclusive thereof, as would necessarily be the case if we accept petitioners' contention in connection therewith. Further competent evidence introduced in connection with claimant's wage-earning capacity is as follows (claimant testifying):

"Q. Now, Mr. Franklin, during this period of time—that is, since December 9, 1930,— have you done any kind of work? A. I tried to. Q. I didn't ask you that; I asked you if you had done any kind of work. A. No, I hadn't. Q. Have you tried? A. I have. Q. What have you tried to do? A. I tried to build a back step down at my sister's. Q. Did you try to do anything else? A. Well, I walk. Q. What has been your condition? A. Stiffness in the back and pain. Q. What do you mean by pain? Where is the pain? A. It goes to the fracture and around the fracture continually. Q. Have you engaged in any occupation for which you have received wages or any other remuneration? A. I have not."

Claimant continued with the further testimony:

"Q. You testified on cross-examination that you were offered employment by the Dunning Construction Company about the first of the year 1933? A. Yes. Q. And that you refused the same? A. Yes. Q. Do you know what kind of employment that was? A. Carpenter work. Q. You stated that you refused to accept the same? A. I did. Q. Now, can you assign a reason for that? A. Because I knew I could not do the work. Q. Well, how did you know that? A. Because I didn't have the strength. I couldn't stoop over."

Dr. White testified, in part, as follows:

"Q. All right; then why, after the passage of six, eight or ten months, or a year from the accident, if he had no neurological symptoms at any time, shouldn't the condition have corrected itself in such a manner that he could perform labor? A. No, I don't think so. Q. Why not? A. Just because of the amount of strength that he would use to perform any kind of duty. Those muscles—any straining of the arms throws strain on the muscles of the back and it would tend to aggravate that condition in his back. As it is now, he has very little arthritic development there and if he goes to using his back he would develop a lot of arthritis there and cause more pain. Q. Isn't it true that where you have a compression fracture and do not have any neurological disturbances there is no reason in the world why, after the passage of sufficient time to let the inflammatory trouble caused by the crushing of that bone subside, the person then should not go about his normal duties, with possibly some limitation of motion, due to the stiffening process which takes place when the bones are healing? A. No. I don't believe I have ever seen one. When you get as bad a compression fracture as that man, at his age, they will never do any more work. Their working days are over. Now, Dr. Collins put him in an extension. I didn't see the X-rays at the time, but Dr. Collins put him up in a cast for several weeks there and

he got very little reduction in the fracture, I suppose. It might be that it was lipped worse then that it is now. I didn't see the X-rays at the time of the injury to see how much reduction he got of the fracture. With a man with this much compression fracture and at his age, I don't think he will ever do any more work. Q. None at all? A. No. Q. Of any kind or character? A. No kind of manual work, or anything like that. If he—he shouldn't try it—shouldn't attempt it, because he's liable to make some pressure on the cord and then he will get neurological symptoms."

Dr. Buchanan testified, in part, as follows:

"Q. That being the case, why should not this man, after the passage of eight or ten months or a year, during which time the bone is healing, be able to resume his duties? A. Well, the reason he doesn't have any neurological disturbance is because where the nerve comes out of the spine—nerve comes out of the cord, it isn't disturbed. That part of his vertebra is not disturbed. I never saw in my experience but one case that had disturbance in the nerve supply, and that was where there were two of the vertebra crushed in on the foramen which transmits the spinal nerve in that region from the cord. In this man's case that is not disturbed. The reason he is disabled is due to the compression fracture. There isn't any of the 12th vertebra left that carries the load. The body of the vertebra is the part that is crushed; the back part, where the nerves pass out, is not disturbed. It's the front segment that pinches down—or is crushed together. That doesn't afford him any support. It looks like eventually this man will tip clear over the front and get where he can't raise up at all."

Dr. Moore testified, in part, as follows:

"A. Well, I don't believe, Mr. Pierce, you have covered all the possibilities in these cases. Q. What other is there? A. One of the major dangers in these cases is that you have marked kyphosis at any time subsequent to the injury when the man begins to lift or carry heavy objects. Q. After bone is formed? A. You understand, no bone has formed in this man's crushed vertebra, except actually in the vertebra itself. It has not been splinted like broken bone. No mere spinal column can splint itself, like a broken humerus or radius or one of the long shaft bones. This man's spine is being kept straight by muscular act—largely of his spinal column—of the musculature surrounding the spinal column and not any bony development or callous formation—I should say. Q. That's what keeps anybody's spine straight. isn't it? A. What's that? Q. The muscles? A. Some, but the spine being a lever and one disc working on the other in the upright position also is a great factor in keeping the spine straight. Q. Don't compression fractures without neurological involvement get sufficiently well so that they can work? A. Not work like you and I mean when we speak of work. Q. What I am trying to get at is this: They may have a limitation in the kind of work they can do and may have to eliminate heavy work, but can't they do some kinds of work? A. What do you mean by work? Q. I mean earn some kind of living. A. You would have to define the kind of work he could do before I could pass on it. I think I have some idea of what this man's disability is. Q. Tell us what he can do. A. I don't believe he can do anything in the common understanding of work—manual labor. I don't know of anything he could do. Now, if this man—(strike that). I think that expresses my opinion—my belief about the matter as well as I know how."

We think the above testimony is sufficient to support the finding of the Commission in effect that the claimant was unable to do the work offered to him in this case by the employer.

Petitioners insist that one claiming compensation who remains capable of performing remunerative employment must make active efforts to procure work, citing White Oak Refining Co. v. Whitehead, 149 Okla. 297, 298 P. 611. They also cite the case of Fursman Coal Co. v. State Industrial Commission, 105 Okla. 261, 232 P. 802, with the suggestion that claimant's testimony to the effect that he could not do the work offered him is a mere surmise on his part. We think the above-quoted evidence is sufficient to support the finding of the Commission that the claimant has fulfilled his duty in this respect, and that it is sufficient to show that claimant's opinion that he could not do the work offered him is not a mere surmise on his part. His opinion as to this appears to be amply sustained in that he tried to do a small job of carpenter work, and could not, and by the medical experts who testified. The evidence herein is sufficient to have supported a finding by the Industrial Commission that the claimant at the time of the hearing has no earning capacity. There is also evidence which would have supported a finding by the Commission that the claimant's earning capacity is greater than $1 per day. In such circumstances this court will not disturb a finding by the Commission that the claimant herein had wage-earning capacity of $1 per day.

The award of the State Industrial Commission herein is affirmed.

RILEY, C. J., and SWINDALL, McNEILL,

OSBORN, BAYLESS, and BUSBY, JJ. concur. CULLISON, V. C. J., and ANDREWS, J., absent.